METTE J. FORDAN and
BARRY L. FORDAN
4431 Richmond Avenue
Fremont, California 94536-6878

Telephone: 510-793-1870

Email: mette.fordan@gmail

Attorneys IN PROPRIA PERSONNA

FILED

MAY 23 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CV17   2949   JCS

METTE J. FORDAN and
BARRY L. FORDAN

    Plaintiffs,

vs.

SAN FRANCISCO STATE UNIVERSITY;
DR. LESLIE E. WONG, PH.D., President and Chief
Executive; DR. DOUGLASS W. BAILEY, PH.D.,
Professor of Anthropology/Archaeology

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.

COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983.

<u>TRIAL BY JURY DEMANDED</u>

## JURISDICTION

1. This action arises under Federal Statutory Law Title 42 U.S.C. § 1983.

    A. This action also arises under the Constitution of the United States, and

        particularly Article I, Section 8, Clause 3 (the "Commerce Clause") and

        the Fifth (5th) and Fourteenth (14th) Amendments thereto, interstate financial

        commerce between the States of California, Wisconsin, and Georgia and

        Washington, D.C.

    B. This action furthermore arises pursuant to Statutory Acts of Congress in the

        establishment of the United States Department of Education and the

governance, acts and duties of officials of said Department and the regulation

of duties of those officials by Congress and the Secretary of Education.

2. Jurisdiction of this Court is invoked under Title 28 U.S.C. § 1331 and § 1343 (a)(3) and (4).

    A. Subject-Matter Jurisdiction involves Federal-Question Jurisdiction

pertaining to a Department of the United States Government, the United

States Department of Education (hereinafter referred to as "U.S.D.E."), the

underwriter, [located in Washington, D.C. (United States Department of

Education, 400 Maryland Avenue, SW, Washington, D.C. 20202) and the State

of Georgia (United States Department of Education, P.O. Box 530229,

Atlanta, GA 30353-0229)] and Great Lakes Higher Education and Affiliates

Corporation (hereinafter referred to as "Great Lakes"), a loan servicing

company, [located in the State of Wisconsin (Great Lakes Higher Education

and Affiliates Corporation, 2401 International Lane, Madison, WI 53704) and

the State of Georgia (Great Lakes, P.O. Box 530229, Atlanta, GA 30353-0229)]

pertaining to Title 20 USC Section 10078-8, Unsubsidized Stafford Graduate

Student Loan.

3. There exists between the parties hereto an actual controversy, justiciable in character, in regard

to which Plaintiffs require a verification of Plaintiffs' rights, damages and relief by this Honorable Court.

## VENUE

4. Defendant San Francisco State University is an educational institution with its education

and business location in San Francisco County within the Northern District.

5. Defendants, all and each of them, are residents of the State of California in which the

Northern District is located.

6. Plaintiffs are residents of Alameda County in the State of California in which the Northern

District is located.

7. Pursuant to Title 28 U.S.C. § 1391 all events, actions, statements and communications

between Plaintiff Mette J. Fordan and Defendant Dr. Douglass W. Bailey, Ph.D. took place within the Northern District.

INTRADISTRICT ASSIGNMENT

8. This lawsuit should be assigned to the San Francisco Division of this Court because all events or omissions which give rise to this lawsuit occurred at, or emanated from, Defendant San Francisco State University, located in, and of, the County of San Francisco.

PARTIES

9. Defendant SAN FRANCISCO STATE UNIVERSITY (hereinafter referred to as Defendant SFSU or "SFSU") is, and was, at all times relevant, a University, a campus of the California State University (CSU) system, conducting activities in the State of California, County of San Francisco, at 1600 Holloway Avenue, San Francisco, California 94132. Defendant SFSU is authorized to conduct all activities of a University, including, but not limited to, the granting of undergraduate Baccalaureate and graduate Masters Degrees.

10. Defendant DR. LESLIE E. WONG, PH.D. (hereinafter referred to as Defendant WONG or "WONG") is, and was, at all times relevant, President and Chief Executive of Defendant SFSU. Defendant WONG is an employee/principal of Defendant SFSU. WONG is authorized and charged with the administration and compliance of University Rules, Regulations, directives and policies and State and Federal Laws deemed necessary for the administration of Defendant SFSU and performance of University business and the execution of University functions.

11. Defendant DR. DOUGLASS W. BAILEY, PH.D. (hereafter referred to as Defendant BAILEY, "BAILEY", or "Defendant") is, and was, at all times relevant, Professor of Anthropology/ Archaeology and Graduate Thesis Advisor, Department of Anthropology at Defendant SFSU. Defendant is an employee/agent of Defendant SFSU and reports to Defendant WONG.

12. Defendants, all and each of them, are being sued jointly and severally by Plaintiffs.

13. Plaintiff METTE J. FORDAN (hereinafter referred to as "Plaintiff"), between August 23, 2010 and May 31, 2014, was, at all times relevant, a full-time Graduate Student in the Department of

Anthropology at Defendant SFSU in the capacity, herein, so stated.

14. Plaintiff BARRY L. FORDAN (hereinafter referred to as Plaintiff B. FORDAN) is, and was, at all times relevant, husband and spouse to Plaintiff. In calculating Plaintiff's Unsubsidized Stafford Graduate Student Loan repayment plan, the United States Department of Education/Great Lakes Higher Education and Affiliates Corporation requested and utilized Plaintiff B. FORDAN's personal and family income in all Loan-related matters. Plaintiff B. FORDAN's income was utilized to determine Plaintiff's final monthly repayment amount. The result of this procedure elevated Plaintiff's final monthly repayment amount over an amount that would have been substantially lower had the U.S.D.E./Great Lakes considered Plaintiff's income alone. Additionally, should Plaintiff be in default on the Loan, Plaintiff B. FORDAN would be at financial risk for Plaintiff's repayment of said Loan. Thus, through these events, and possible future events, Plaintiff B. FORDAN became a party to this action.

15. Plaintiffs are informed and believe and thereupon allege that Defendant BAILEY is and, at all times relevant mentioned herein, was the agent of Defendant SFSU and Defendant WONG, principal, in that, at all times relevant mentioned herein, was authorized and empowered to act, and did act, as the agent of other Defendants.

16. Plaintiffs are informed and believe, and thereupon allege, that Defendant BAILEY acted, or failed to act, with each and every other Defendant, intended to and did participate in the events, acts, practices and course of conduct alleged herein, and was a proximate cause of damage and injury, thereby, to Plaintiffs as alleged herein.

STATEMENT OF FACTS/CHRONOLOGY OF EVENTS LEADING TO ACTION

Plaintiffs complain against Defendants, all and each of them, demand a Trial by Jury of all issues, and for causes of action allege and hereby incorporate the allegations as set forth in Paragraphs 1 through 16, inclusive, above.

17. In 1970, at the age of ten (10), Plaintiff METTE J. FORDAN first developed a fascination and an interest in North American Native Cultures/Archaeology. (Plaintiff is a citizen of Norway, becoming a lawful permanent resident of the United States and the State of California in October, 1981 after Plaintiff's marriage to Barry L. Fordan, a citizen of the United States and the State of California.) By

1    March, 1974 Plaintiff was so well-read on the subject that Plaintiff's older sister, Anne Jansen, took

2    Plaintiff to meet Professor Dr. Fredrik Bart, Ph.D., the world renowned Norwegian Cultural

3    Anthropologist, Department of Anthropology, University of Oslo, to seek part-time work for Plaintiff in

4    the field of Archaeology as a career path.

5          18. In October, 1981 Plaintiff re-located from Oslo, Norway to Fremont, California. In

6    January, 1982 Plaintiff began formal collegiate education by attending Ohlone College in Fremont. In

7    June, 1984 Plaintiff graduated and received the Associate of Arts (A.A.) Degree in Liberal Studies,

8    specializing in Anthropology/Archaeology.

9          19. In January, 1986 Plaintiff transferred to the Department of Anthropology, San Jose State

10   University, specializing in Indigenous Peoples, New World Archaeology and the Archaeology of

11   California Native Cultures. In December, 1988 Plaintiff graduated San Jose State University with a

12   Bachelor of Arts (B.A.) in Anthropology/Archaeology.

13         20. From January, 1989 until August, 2010 Plaintiff worked in the field of Business.

14         21. In 2008 to 2009 Plaintiff contemplated a return to the University, specifically Graduate

15   School, with the intent of pursuing a Doctorate, Ph.D. Degree. After spending 21 years in the Business

16   world Plaintiff greatly desired to continue pursuing a life-long dream of a career in Anthropology/

17   Archaeology. Plaintiff sought out the best expert Archaeologist in the Bay Area in Plaintiff's specialized

18   research interest of Zoomorphic Figurines.

19         22. On April 20, 2009 Plaintiff met with Professor Dr. Ian Hodder, Ph.D., Department of

20   Anthropology, Stanford University in Palo Alto, California. Dr. Hodder is a renowned expert on

21   Archaeological Figurines. He recommended that Plaintiff obtain a Masters Degree prior to applying for

22   the Doctorate. Furthermore, Hodder recommended contacting Dr. Douglass W. Bailey, Ph.D., Defendant

23   in this matter, at San Francisco State University. Defendant had been Hodder's Doctoral student at

24   Cambridge University in England, when Hodder was a faculty member in Anthropology/Archaeology at

25   Cambridge. Hodder suggested that Plaintiff mention the Plaintiff-Hodder meeting and conversation to

26   Defendant.

27         23. In early September, 2009 Plaintiff's first email contact with Defendant was made. [NOTE: All

28

of Plaintiff's 2009 emails prior to October 12, 2009 were deleted by Plaintiff's Yahoo Email

Software Program (Yahoo Email Service) on Plaintiff's computer.]

24. In early September, 2009 Plaintiff and Defendant first met in Defendant's office in the

Anthropology Department. The conversation concerned Plaintiff's taking the Graduate Record

Examination (GRE) and the general subject matter of the Masters Thesis topic.

25. On March 18, 2010 Plaintiff received an "Acceptance" Letter from Defendant, welcoming

Plaintiff to the Graduate Program in Anthropology.

26. On March 30, 2010 Plaintiff emailed Defendant thanking him for Defendant's Letter of

March 18, 2010. Plaintiff informed Defendant that Plaintiff had begun a preliminary Literature search for

the Thesis Project. Plaintiff requested a meeting with Defendant in Defendant's office.

27. On April 20, 2010 Plaintiff received the official "Letter of Acceptance" to Defendant

San Francisco State University's Graduate Division from Dean Dr. Ann Hallum, Ph.D.

28. On May 12, 2010 Plaintiff emailed Defendant a brief outline of ideas for the Masters Thesis

Project. Plaintiff expressed a research interest in Toad and Frog Figurines. Plaintiff, also, expressed a need

for additional field experience since it had been a number of years since Plaintiff's last excavation.

29. On May 22, 2010 Defendant emailed Plaintiff..."I agree that it will be good to discuss topics

of research as soon as possible. I agree that an investigation of the material basis of ritual or religion is

a potentially good topic to focus on, though we will need to discuss the particular research question,

area, period and material. Animals are important, and the frog or toad may indeed by [be] of importance,

though at the moment, I would need to be convinced that an entire MA on the frog or toad would be a

satisfactory use of your intellect and drive. Perhaps you will be able to convince me otherwise. It would

be useful if you wanted to write a short, one-page statement about the big question that you want to ask,

how you plan to answer it, with what impact/results, over what period or area, and with what specific

analytical or theoretical approach."

30. On June 20, 2010 Plaintiff emails Defendant inquiring if the one (1)-page Summary had

been received.

31. From August, 2010 through May, 2011 Plaintiff registered for and enrolled in a full-time

Graduate and Undergraduate Upper Division course load. Any time devoted to Thesis research and writing occurred concurrently.

32. On, or about, August 23, 2010 the U.S.D.E. transferred Plaintiff's Fall Semester tuition payment for Plaintiff's Unsubsidized Stafford Graduate Student Loan to Defendant SFSU's Office of Financial Aid. This financial transaction completed the binding Contractual Relationship between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY.

33. Fall Semester, 2010 begins August, 2010.

34. On September 10, 2010 Plaintiff is now a full-time Graduate student in the Anthropology Department. Plaintiff requests a meeting in Defendant's office for Tuesday, September 14, 2010.

35. On September 22, 2010 Plaintiff meets Defendant in Defendant's office. The scientific literature, Plaintiff's Santa Barbara trip to examine photographic slides of Toad and Frog images by famed archaeologist Dr. Maria Gimbutas, Ph.D., and the theme of Toads and Frogs were discussed.

36. On September 24, 2010 Plaintiff emailed Defendant stating Plaintiff would stop by Defendant's office with a Plaintiff-initiated Progress Report.

37. From October 1, 2010 until December, 2010 Defendant "disappeared" from the campus. Faculty and Administrators offered no explanation as to Defendant's whereabouts. Defendant returned to campus the week of final examinations. Defendant was inaccessible to Plaintiff during this time.

38. Spring Semester, 2011 begins January, 2011.

39. On, or about, January 24, 2011 the U.S.D.E. transferred Plaintiff's Spring, 2011 Semester tuition payment from Plaintiff's Unsubsidized Stafford Graduate Student Loan to Defendant SFSU's Office of Financial Aid. This financial transaction completed the binding Contractual Relationship between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY. This tuition payment from the U.S.D.E. completes Plaintiff's first academic year of Graduate study at Defendant SFSU. Plaintiff has two more years remaining on Plaintiff's

U.S.D.E. Unsubsidized Stafford Graduate Student Loan in which to complete Plaintiff's Masters Degree.

40. The week of January 24, 2011 Defendant was on campus and in Defendant's office.

41. Classes began on January 24, 2011. On Thursday, January 27, 2011 Plaintiff met with Defendant in Defendant's office. Plaintiff expressed a desire to excavate on an archaeological site in the Summer, 2011. Defendant's response was "Go on the Internet!" [In one of the 2009 meetings, regarding excavating at an archaeological site, Defendant said to Plaintiff, "I know people. I can just pick up the phone and say 'I have a student here, can you help her out?'"]

42. From February 1, 2011 to May 24, 2011 Defendant, again, "disappeared" from campus. Again, no explanation as to Defendant's whereabouts was offered by Faculty or Administrators. Defendant was inaccessible to Plaintiff during this time.

43. From early February, 2011 Plaintiff was asked by Dr. Gary Pahl, Ph.D., Professor of Archaeology to teach Defendant's undergraduate Anthropology 301, Introduction to Archaeology course. From February to May Plaintiff was co-instructor with Dr. Charlette Sunserri, Ph.D. [Not once did Defendant ever acknowledge Plaintiff covering the class for Defendant when gone, let alone thank Plaintiff for the assistance.]

44. Fall Semester, 2011 begins August, 2011.

45. On, or about, August 22, 2011 the U.S.D.E. transferred Plaintiff's Fall, 2011 Semester tuition payment from Plaintiff's Unsubsidized Stafford Graduate Student Loan to Defendant SFSU's Office of Financial Aid. This financial transaction completes the binding Contractual Relationship between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY. This tuition payment from the U.S.D.E. begins Plaintiff's second academic year of Graduate study at Defendant SFSU. Plaintiff has one and one-half (1 1/2) more years remaining on Plaintiff's U.S.D.E. Unsubsidized Stafford Graduate Student Loan in which to complete Plaintiff's Masters Program.

46. On September 8, 2011, in regard to the "Foreign Language Assessment Examination (FLAE), Plaintiff emailed Defendant stating what Dr. Mark Griffin, Ph.D., Anthropology Department Graduate Coordinator, had told Plaintiff about the FLAE. Plaintiff states to Defendant "Just wondering why I have

to jump these hoops....In my opinion it is sort of discrimination to think that everybody reads or speaks

French, German, or Spanish."

47. On September 9, 2011 Defendant emails Plaintiff. "Thanks for raising your concerns

[regarding the FLAE]. I am sure that you will appreciate that the MA Program is required to maintain its

stated standards. In this sense Dr. Griffin's request is nothing more nor less that [than] the Graduate

Committee's continuing work to ensure that the standards that the University have set are fully and

transparently met. As you may imagine occasionally students who[se] excellent understanding of

particular foreign languages (which are distinct from the language they need to carry out their research)

try to avoid meeting the language requirement for the degree. Also, as I am sure as you are aware it is

possible to satisfy the language requirement by taking the Statistics class....I can see no evidence that the

Graduate Committee reflects any discriminatory action. The Dept. has a strong record of assessing MA

students in a diverse set of languages which stretch well beyond French, German, and Spanish." [While

Defendant cites Department and University "standards", Defendant fails to cite specific, encoded

standards and fails to direct Plaintiff where to read such "standards".]

48. On September 9, 2011 Defendant emails Plaintiff [Re: Research Proposal Draft]. "I

have been critical in my comments and that is my role as your advisor."

49. On September 19, 2011 Plaintiff emails Defendant, making note of published

archaeological scientific papers on the frog by Norwegian authors.

50. On September 20, 2011 Defendant emails Plaintiff. "Keep up the work based on my

comments on your latest Draft Thesis Proposal. Have you had a chance to draft a two-page description of

your Project?"

51. On September 21, 2011 Plaintiff emailed Defendant. "I was thinking about your idea

of the two-page summary....I believe I already did that. It was over a year ago. Right now I think the best

thing would be to move forward with the research proposal. Working on that right now....I have some

good stuff I want to share with you."

52. On September 21, 2011 Defendant emailed Plaintiff. "When I read your most recent

draft of work towards the thesis proposal, I came to be convinced that you needed to focus your thoughts,

methods, and approach in the two-page essay as I suggested. I remain convinced that such a task will be of great value to you in your research and in your progress to your MA thesis....Based on what you have submitted to me, I am not convinced that you are ready to move on to the formal thesis proposal, especially if your plans remain that you would like to be finished with the thesis by the end of 2013 spring term....There is a lot to be done, and the best next step is the essay I suggested. In fact, in writing the two-pages, as I proposed (and I have cut and pasted the details of my suggestions below), you will be making tremendous progress in your research."

53. On September 30, 2011 Defendant emailed Plaintiff. "This is looking better. I attached the text with my comments inserted and an assignment for you to work on over the next two weeks." During the period of time October 1 to October 21, 2011 a meeting was conducted in Defendant's office with Plaintiff. In order to expedite the Thesis research and writing it was agreed between both Plaintiff and Defendant that the Masters Thesis Project would be changed from a focus on Old World, Eastern European archaeology to New World, Meso-American archaeology.

54. On October 21, 2011 Plaintiff emailed Defendant. "Here's the write-up on the Bio. I am continuing with the Olmec and there will be more on the hallucinogens."

55. On October 24, 2011 Defendant emailed Plaintiff. "I attached my comments with your latest work with my comments inserted. This is much better and I can now see that you are making progress. When will you be able to get me your piece of work, on the Olmec iconography perhaps?"

56. From the last week in August through December, 2011 Plaintiff and Defendant conducted seven (7) or less meetings in Defendant's office.

57. Spring Semester, 2012 begins January, 2012.

58. On, or about, January 23, 2012 the U.S.D.E. transferred Plaintiff's Spring, 2012 Semester tuition payment from Plaintiff's Unsubsidized Stafford Graduate Student Loan to Defendant SFSU's Office of Financial Aid. This financial transaction completed the binding Contractual Relationship between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY. This tuition payment from the U.S.D.E. completes Plaintiff's second academic year of Graduate study at Defendant SFSU. Plaintiff has one more year remaining on Plaintiff's

1  U.S.D.E. Unsubsidized Stafford Graduate Student Loan to complete the Masters Program.

2      59. On March 1, 2012 Defendant requests a meeting with Plaintiff and Dr. Mariana Ferreira,

3  Ph.D., Professor of Anthropology, Cultural Anthropology specialization, in the next couple of weeks..."a

4  'team' discussion on how you [Plaintiff] are progressing with the Thesis Research." [This would be the

5  first opportunity for Dr. Ferreira to consider joining Plaintiff's Thesis Committee.]

6      60. On March 24, 2012 Plaintiff emails Defendant, requesting a meeting of the Thesis Committee

7  on March 29.

8      61. On March 24, 2012 Defendant emails Plaintiff. "Yes, this sounds good. Please send

9  Mariana and me a short summary of your progress in your work. This should include a short comment on

10  your progress with course work (e.g., the statistics/language requirement) and a more detailed statement

11  of what work you have completed on your research over the past 12 months and what your plans are (with

12  specific goals) for the next 12 months."

13      62. On March 26, 2012 Plaintiff emails Defendant, reporting on an email received from

14  Dr. Mark Griffin, Ph.D. regarding the "Annual Graduate Student Review" (a form to be filled out). [It was

15  now a Department requirement. There was no record of the form's existence prior to Griffin assuming

16  the job of Department Graduate Coordinator in August, 2011.]

17      63. On March 29, 2012 Plaintiff's Thesis Committee met in Defendant's office. Defendant and

18  Ferreira talked to each other discussing Plaintiff, however, talking over Plaintiff's head. At one point

19  Defendant states to Ferreira "It's ONLY a Masters Thesis!" Plaintiff felt like a "bystander" between the

20  two individuals. [There were previous professional relationship issues between Defendant and Ferreira

21  that served as the basis for this behavior, unknown to Plaintiff at the time.]

22      64. On April 25, 2012 Defendant emails Plaintiff. Defendant attaches a letter, the "Annual

23  Review of Progress", written by Defendant. Defendant and Ferreira reviewed the Progress Report. "As

24  Marianna and I [Defendant] discussed with you [Plaintiff] when we met on March 29, we can see a clear

25  path for you [Plaintiff] to make progress on your 'culminating experience' and the eventual date for

26  completion will depend on the rate and quality of that progress." [It is clear that the Defendant is focused

27  on establishing a "process" rather than an "end-product", the Thesis. With the Defendant the "process"

28

takes precedent over the "end-product". Process is employed as a means of a delaying tactic, never reaching the "end-product" stage.]

65. On April 26, 2012 Plaintiff replaces Dr. Gary Pahl, Ph.D. with Dr. Mariana Ferreira, Ph.D. on Plaintiff's Thesis Committee. Dr. Pahl retired from the University in December, 2011.

66. On April 26, 2012 Plaintiff emails Defendant requesting a meeting before May 15, the end of the Spring Semester.

67. On April 29, 2012 Plaintiff emails Defendant concerning the literature on the Toad/Frog.

68. On May 2, 2012 Plaintiff emails Defendant requesting a meeting.

69. On May 2, 2012 Defendant emails Plaintiff saying "Let's agree to the topic of the meeting. Defendant says "I really think you've got something here."

70. On May 2, 2012 Defendant's letter of review of Annual MA Student Review was received.

71. On May 9, 2012 Plaintiff met with Defendant in Defendant's office.

72. On May 28, 2012 Plaintiff emails Defendant outlining a discussion for the "Olmec write-up".

        -General History of Culture and Region
        -Important Site and Archaeology Conducted
        -Cosmology of Olmec
        -Role of the Toad in that Cosmology
        -A Discussion of Figurines, what kinds, etc.

Plaintiff states "This should make for a good Introduction to the Olmec."

73. On May 30, 2012 Defendant emails Plaintiff saying "For the Olmec background chapter:

      -You need a historiography of Olmec archaeology (the main people, the main
        sites, the main publications and the main debates)
      -You need a concise understanding of the accepted interpretation of social
        structure and organization of Olmec cultures
      -You need a clear understanding of the absolute chronological sequencing for
        the Olmec with any regional variations and culture historical terminology
      -You need a strong working bibliography to support the historiography and to
        set-up your own work and focus on iconography (plus faunal analysis)."

74. On July 5, 2012 Plaintiff emails Defendant, attaching the "Olmec Chapter".

75. On July 8, 2012 Defendant emails Plaintiff and comments on the "Olmec Chapter".

76. On July 8, 2012 Plaintiff emails Defendant by defending Plaintiff's ideas and writing.

[Plaintiff began to "push back" on Defendant.]

77. On July 9, 2012 Defendant emails Plaintiff stating "This is my role as your supervisor."

[Defendant is <u>NOT</u> a "supervisor", but suppose to be a "facilitator" of a process established by the student because the student is paying for the education. Defendant is establishing the parameters for the Student-Graduate Thesis Advisor Relationship. Moreover, Defendant establishing the parameters for the Thesis by stating "more research remains". Setting the parameters of the Thesis research and writing is the prerogative of the Graduate Student, especially for one who is paying entirely the cost of the education. Defendant has not provided a Graduate Scholarship or financial support, which would give Defendant a "supervisory" role. An example would be a Graduate Student receiving a United States Public Health Service Fellowship whereby the education is paid entirely by the United States Government and the Thesis Advisor becomes, in fact, a research and Thesis supervisor, directing the research, writing and all aspects of the student's academic life.]

78. On July 9, 2012 Plaintiff emails Defendant, responding to Defendant's statements.

79. On July 23, 2012 Plaintiff emails Defendant, submitting a re-write of "Olmec Chronology".

80. On July 25, 2012 Defendant emails Plaintiff. "Both of these drafts are much better. Good job....writing is better...clearer and more direct." [Defendant never finalizes a Chapter, a Section, a Paragraph, or even a Sentence. More comments are always offered. There is <u>NEVER</u> a final product. The process is on-going, forever.]

81. On July 31,2012 Plaintiff emails Defendant regarding the "Art" Section.

82. On July 31,2012 Defendant emails Plaintiff offering suggestions for the Art Section. [Meanwhile Defendant offers a rather enlightening and prophetic statement regarding the end process.] "Plan for setting aside a significant amount of time in the end phase of your thesis writing experience for getting illustrations into decent form, for making maps, etc....it takes a lot longer than anyone ever imagines...."

83. On August 12, 2012 Plaintiff emails Defendant, submitting a re-write of the "Settlement" Section of the Thesis.

84. Fall Semester, 2012 begins August, 2012.

85. On, or about, August 20, 2012 the U.S.D.E. transferred Plaintiff's Fall, 2012 Semester tuition payment from Plaintiff's Unsubsidized Stafford Graduate Student Loan to Defendant SFSU's Office of

Financial Aid. This financial transaction completes the binding Contractual Relationship between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY. This tuition payment from the U.S.D.E. begins Plaintiff's third academic year of Graduate study at Defendant SFSU. Plaintiff has one more semester's payment remaining on Plaintiff's two (2) to three (3) year U.S.D.E. Unsubsidized Stafford Graduate Student Loan.

86. On September 11, 2012 Defendant emails Plaintiff. "I have signed your ATC ["Advance To Candidacy"] form and sent it to the Graduate Coordinator [Dr. Mark Griffin]. About the Proposal for Culminating Experience, I have your form (Mariana handed it to me), but I do not have a Thesis Proposal, and I do not think that you have sent me a draft thesis proposal for me to offer comments and suggestions. If I have missed it, please send it again....or are you working on it with Mariana? In any event, have you read the relevant sections in the MA Student Handbook about the Thesis Proposal, what it contains and when it is due (see pp. 26-28)? [Was this the University Handbook from 2012-13 or the Handbook from 2010-11, which is part of the binding contract between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY?]

87. On September 14, 2012 Defendant emails Plaintiff concerning the MA Handbook guidelines and Plaintiff's previous writings.

88. On September 14, Plaintiff emails Defendant acknowledging a re-write of the "Thesis Proposal".

89. On September 17, 2012 Defendant emails Plaintiff. "The Thesis Proposal needs to show that you are in a solid position to proceed to the thesis proper." [Plaintiff has been writing sections of the Thesis itself. Now, Plaintiff is required to go backwards and write a "Thesis Proposal"? Defendant continually goes back and forth on process. NEVER is anything ever finalized by Defendant.]

90. On September 20, 2012 Plaintiff emails Defendant "Will you help me prepare a petition to the chairman of the dept., anthropology graduate committee or who's purview this entails requesting an extension of the October 1 deadline, because it is obvious that I can not meet this deadline with all the details you are requiring?"

91. On September 21, 2012 Defendant emails Plaintiff. "My understanding is that the process for

petitioning for the waiver of a regulation usually applies to University requirements and not department-level policies. However, the best thing for you to do is speak with the Graduate Coordinator and see what procedure he suggests, and to ask if an extension is possible....As I see it, whether it is possible to get an extension is only one part of the challenges....My concerns over the contents of your draft Thesis Proposal focused on significant areas of research that you need to do and which I have not seen evidence that you have completed yet. In this respect, my comments were less about the contents of the Thesis Proposal (and thus matters that only need extra time to reformat or rewrite), but with the range and depth of work that you have completed and which you would be in a position to summarizing in a Thesis Proposal if an extension was possible....If I am incorrect in my thinking, and thus if you have completed the more detailed work on the material that you will be analyzing, the approach that you will be taking, Olmec archaeology (particularly existing publications on Olmec myth and religion), the role of the toad in ethnographies and mythologies of the religion, and a more robust bibliography for all areas of your research, then you are in a better position both to complete the Thesis Proposal and to proceed to the thesis class. I have not seen any writing from you on the material or on the approach (and our last exchanges on the Olmec work left some areas unfinished), so I have assumed that you have more work to do in all of those areas."

92. On September 21, 2012 Plaintiff emails Defendant. Dr. Griffin grants an additional three (3) weeks extension to Plaintiff in order to complete the Thesis Proposal. Plaintiff requests a meeting with Defendant.

93. On September 25, 2012 Plaintiff meets with Defendant in Defendant's office to create an outline of specific deadlines for the various Thesis Chapters. But, Thesis Proposal is not yet completed.

94. On October 3, 2012 Defendant emails Plaintiff. "Let me know if you need any help." [To this date, not once has Defendant materially helped Plaintiff to produce a final Thesis version. Defendant's "help" is a mere platitude.]

95. On October 8, 2012 Plaintiff emails Defendant the "Thesis Proposal". The "Thesis Proposal is twenty-five (25) (+) pages. [Defendant's page requirement exceeded the Department average Thesis Proposal by ten (10) to fifteen (15) pages.]

96. On October 9, 2012 Plaintiff meets with Defendant in Defendant's office.

97. On October 9, 2012 Defendant emails Plaintiff, attaching "Thesis Proposal" with Defendant's comments. Defendant comments only on the first twenty (20) percent of the 25-page Thesis Proposal. Defendant states "Lots of good progress. Keep at it." [Again, a very prophetic statement. Defendant NEVER finalizes any part of Plaintiff's written work, NOR does Defendant ever materially advance Plaintiff to the conclusion of a final copy of a MA Thesis.]

98. On November 7, 2012 a meeting between Plaintiff and Defendant took place in Defendant's office. Defendant, for the first time, introduces the "General-to-Specific-to-General" Writing Style (hereinafter, referred to as the "Bailey Standards") which Defendant is insistent that Plaintiff incorporate in the writing of Plaintiff's MA Thesis.

99. On November 19, 2012 Plaintiff emails Defendant about the Mythology Section. "The mythology section is going into the thesis....I [Plaintiff] am in a better position to write about the mythology of frogs/toads and relate it in general terms to ideas about water, fertility, etc. which are present in Meso-America. I have a huge amount of information about the image of the frog/toad in South America. It is all over the place there."

100. On November 20, 2012 Defendant emails Plaintiff about the Mythology Section. "I [Defendant] am less clear about what you intend about mythology. Please let me have a clearer idea of what you intend. My concern is that "mythology" is a huge subject and it may not be one that can be added at this stage in the thesis work. You have enough work to complete as is and adding a new large section does not seem to be a good idea if you still plan to finish in May."

101. "What do you mean by mythology? Mythology in Anthropology? Mythology in Archaeology? Mythology for the Olmec? All three of these subjects are large (the first two well beyond the scope of what you plan to do and the time that you have to do it in)...there is also the potential issue that our knowledge of mythology of the Olmec probably requires an understanding of modern ethnography in the region (or at least how ethnography has been used to reconstruct an Olmec)....Is your proposal to include a new section that handles mythology on its own? I am not convinced that this is a wise decision at this point in the game."

102. On December 1, 2012 Plaintiff emails Defendant "Background" Draft of the Thesis.

103. On December 2, 2012 Defendant emails Plaintiff.  "...let's get each of the sections done in draft form."

104. On December 3, 2012 Defendant emails Plaintiff's  "Background" Draft of the Thesis with Defendant's comments. "I attach your draft here with my comments inserted as usual...and with more general comments at the start...before you continue with your next chapter draft, please read the comments at the start, esp. the one about the structure of your writing....You have done a lot of work on the background chapter, though I remain concerned that you will not be in a position to submit an acceptable thesis by the May deadline. If you want to talk, let's do so...though please read the comments first."

105. Defendant re-iterates the "General-to-Specific-to-General" Writing Style. [Why did not Defendant introduce this writing style in 2010 or, at least, in 2011 when Plaintiff first began submitting written sections? Where is this writing style codified in the University or Department Handbook? Defendant is continually "moving the goal posts". Defendant does nothing to shorten the amount to be written in order to meet the May graduation date. On the contrary, Defendant continually adds new requirements, expanding the amount of work required by Plaintiff. Defendant appears less concerned with meeting the May graduation date than in providing methods or undertaking actions NOT to meet a May graduation. Defendant creates a "Star Chamber" process for Plaintiff.]

106. On December 3, 2012 Defendant emails Plaintiff. "Writing is like a punching match...keep hitting it and hitting it and eventually you will get it into good shape." [Is "eventually" two more semesters, three (3), four (4),...or seven (7) years? Exemplifies Defendant is "qualitative" rather than "quantitative". Defendant is performing the tasks of an editor instead of being a Graduate Thesis Advisor, a facilitator.]

107. On December 31, 2012 Plaintiff emails Defendant, attaching the "Biology" Section and asking how to organize the "Context" Section.

108. On January 1, 2013 Defendant emails Plaintiff. "A very very good job!...Mette: this is your best work to date....I am very impressed! See my comments instead...and keep going."

109. Spring Semester, 2013 begins January, 2013.

110. On, or about, January 21, 2013 the U.S.D.E. transferred Plaintiff's Spring, 2013 Semester tuition payment from Plaintiff's Unsubsidized Stafford Graduate Student Loan to Defendant SFSU's Office of Financial Aide. This financial transaction completes the binding Contractual Relationship between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY. This tuition payment from the U.S.D.E. completes Plaintiff's third academic year of Graduate study at Defendant SFSU. This transaction is the final tuition payment on Plaintiff's U.S.D.E. Unsubsidized Stafford Graduate Student Loan. Plaintiff has utilized the maximum possible monetary amount the U.S.D.E. Unsubsidized Stafford Graduate Student Loan permits a Graduate Student to borrow. Graduation is expected by the U.S.D.E. in May, 2013.

111. On February 3, 2013 Plaintiff emails Defendant the "Context of Material" Section and a file of pictures which will be included in the discussion.

112. On February 4, 2013 Defendant emails Plaintiff his "comments" on the "Context of Material" Section. "As you [Plaintiff] will see I [Defendant] have significant concerns about the completeness of both the inventory of material (limited to 15 items) and more problematically of your description and discussion of previous scholar's work on this material....I [Defendant] repeat my concerns about whether or not you will be in a position to successful[ly] submit a complete Thesis that will be satisfactory by the upcoming deadline."

113. On February 16, 2013 Plaintiff emails Defendant outlining the method of meeting the March 28 [18] Department deadline for Thesis submission.

114. On February 16, 2013 Defendant emails Plaintiff a section from the Anthropology MA Handbook, the Handbook re-written by Dr. Griffin in 2012, [not the Handbook from 2010, the one in which Plaintiff entered the MA Program in Anthropology and the one under which the Contractual Relationship was initiated between Plaintiff, the U.S.D.E., Defendant SFSU, Defendant SFSU's Office of Financial Aid, and Defendant BAILEY. It is the 2010 Handbook which lawfully applies to Plaintiff.] "For the last chapter that I sent back to you I had significant concerns about the level of detail and the scope of the discussion on previous work on the topic. Since I sent you those comments I have not received any

further work from you to allay those concerns. Furthermore, I have not seen a complete draft of your Thesis, only the chapters one by one and even, here, I have not seen every chapter (I have not seen the one you mentioned on Mythology) or a complete introduction, conclusion, or bibliography."

115. "Furthermore, I have not seen the edited chapters that you say you are working on. I repeat my concerns about whether or not you are in a position to complete the Thesis by the 8th week deadline....Based on the work I have seen to date and based on the amount of work that I believe needs to be done before you have a complete final draft, I am not convinced that you are in this position."

116. [The problem with Defendant's statements is Chapters A, B, C, etc. are never finalized. NOTHING ever gets finalized. Plaintiff is on a constant process of re-doing Chapters and Sections over and over and over again.]

117. On March 4, 2013 Defendant emails Plaintiff, returning "Mythology" Chapter, stating "Lots of good examples of toad imagery....Lots of work still to do to get this chapter into final shape."

118. On March 28, 2013 Plaintiff emails Defendant the "Final Thesis Draft" (106 pages).

119. On April 1, 2013 Defendant emails Plaintiff. "We can not consider your Thesis until it's complete...."

120. On April 4, 2013 Plaintiff emails Defendant and submits the "Final Thesis Draft."

121. On April 9, 2013 Defendant emails Plaintiff. "Your Thesis Committee has reviewed the complete "Final Draft" that you submitted on April 4 and I am sorry to inform you that the Committee finds that your submission does not demonstrate the 'clarity of purpose', 'critical and independent thinking', 'an accurate documentation' that is required of a Masters Thesis at SFSU. As a consequence, the Committee is not in a position to approve your Thesis for final submission to the Graduate Division....I suggest we schedule a meeting with Dr. Ferreira, me and perhaps Peter Biella, the Dept. Chair, to discuss the issues with the Draft that you submitted and the work that remains to be done....I am certain that you will be able to complete satisfactorily the Thesis and I look forward to working with you towards that goal." [This is a process Defendant should have performed long before this date. Defendant's failure to facilitate Plaintiff's "goal" is noteworthy of a "Star Chamber".]

122. On April 9, 2013 Plaintiff emails Defendant inquiring if the Thesis can be completed in the

Summer, 2013.

123. On April 9, 2013 Defendant emails Plaintiff. "I think so. Tho you need to check with the Graduate Division. I will try to find out what the rules are for completing the Thesis when you have a grade of RP [Report in Progress]....The main thing is to look at what needs to be done and to address those areas of work. Once we have done that then it is a question of completing that work."

124. On April 11, 2013 Defendant emails Plaintiff stating what is in the MA Anthropology Department Handbook regarding completing the Thesis. [Is Defendant referring to the August, 2010 version, under which Plaintiff initiated Plaintiff's MA Program, or the 2012-13 Griffin version of the Handbook?]

125. On April 25, 2013 Defendant emails Plaintiff. "The Term ends on May 24 and we need to meet before then to agree a strategy for you to complete your Thesis." [Again, this is a process Defendant should have performed and a "strategy" should have set in 2010-11, long before this date. Defendant's failure to facilitate Plaintiff's "goal" is noteworthy of a "Star Chamber".]

126. On May 11, 2013 Plaintiff meets with Defendant in Defendant's office. Plaintiff acknowledges that some parts of the Thesis could be improved. Defendant answers back "That is very mature of you to admit." [Defendant's comment is quite condescending in light of the fact that the Plaintiff is 52 years of age at the time of the meeting. Defendant's statement is not one of a facilitator, attempting to steer Plaintiff across the proverbial "goal line". Rather, this statement is one of a "gatekeeper", of a person determining who completes the MA process and graduates.]

127. Plaintiff states that the Thesis will be worked on during the Summer, 2013. Defendant, then states "Go see Mariana!" [Dr. Ferreira could not attend the meeting. Defendant's statement was taken by Plaintiff as "dismissive".]

128. On May 31, 2013 Plaintiff's third (3rd) academic year ends. The U.S.D.E. Unsubsidized Stafford Graduate Student Loan calls for a financing protocol of two (2) to three (3) years, maximum. Defendant SFSU's Graduate Student 2010 Handbook calls for a two (2) year Masters Program. Plaintiff's U.S.D.E. Unsubsidized Stafford Graduate Student Loan "maxed-out" at three (3) years. Defendant is requiring Plaintiff to attend at least one (1) more Semester to complete the two (2) year

MA Program in Anthropology.

129. Fall Semester, 2013 begins August, 2013.

130. On September 3, 2013 Plaintiff meets with Defendant in Defendant's office. In that meeting Defendant says that Plaintiff has until the eighth (8th) week of the semester to turn in the Draft. Plaintiff says that "This is not a new submission so why do I [Plaintiff] have to follow the '8th week rule' which applies to new submissions?"

131. Defendant states that Defendant will check with the Department Graduate Coordinator, Dr. Griffin. Defendant, the states "You [Plaintiff] are also suppose to submit your Final Thesis Copy in the semester before you [Plaintiff] plan to Graduate, which, in your [Plaintiff] case, is Spring, 2014. But that would put you [Plaintiff] on Probation and you [Plaintiff] are not a probationary student." Furthermore, Defendant states "Let's get this done for a December graduation." [In light of what was to follow, this statement is mere platitude. Defendant had performed NO act, to this point in time, to facilitate Plaintiff's completion of the Masters Thesis and graduate the University.]

132. On September 9, 2013 Plaintiff emails Defendant. "Did you [Defendant] hear anything about the Deadline in October?"

133. On September 9, 2013 Defendant emails Plaintiff. "I asked the Graduate Coordinator [Dr. Griffin] and he suggested that you follow the 8th week deadline....As it will not be possible for us to make significant comments at that late date, I urge you to send me a complete final version of your Thesis well ahead of that if you want my comments."

134. [No actions are ever taken by Defendant to see that Plaintiff meets a timely conclusion to the MA Program process.]

135. On October 1, 2013 Plaintiff emails Defendant, submitting the Final Draft of the Thesis.

136. On October 6, 2013 Defendant emails Plaintiff, rejecting the Thesis. "I [Defendant] wanted to send you [Plaintiff] these comments now, before I had a set of comments from the rest of your Thesis Committee, so that you can work to address them before we reach the final Anthropology Department deadline for submission of the Final Thesis Draft (the 8th week of term)."

137. [Defendant's decision to reject the Thesis was made WITHOUT the full Committee, which

1  included Dr. Ferreira, ever meeting.]

2  138. On October 21, 2013 Defendant emails Plaintiff seeking receipt of confirmation concerning

3  Defendant's October 6, 2013 email.

4  139. On November 12, 2013 Defendant emails Plaintiff. "Please read the attached letter concerning

5  your most recent final draft of your MA Thesis. Please let me know what [when] you will meet with me

6  to discuss that draft and plans for making progress."

7  140. On November 12, 2013 Plaintiff emails Defendant. "Your [Defendant's] email of

8  November 12, 2013 was received. I [Plaintiff] must inform you [Defendant] that this is now a legal

9  matter. All future correspondence must be directed through my attorney...."

10  141. On November 12, 2013 Defendant entered the Anthropology Department office of

11  Dr. Mariana Ferreira to conduct a conversation with Ferreira about Plaintiff. Defendant relates to Ferreira

12  that Plaintiff makes it now a legal matter.

13  142. On November 14, 2013, at approximately 6:00-7:05 PM, Dr. Mariana Ferreira, Ph.D.,

14  Professor of Anthropology and Second Faculty Member (Second Reader) of Plaintiff's MA Thesis

15  Committee, called Plaintiff to conduct a telephone conversation. Dr. Ferreira informs Plaintiff as to the

16  following:

17  A. Dr. Peter Biella, Ph.D., Chair, Department of Anthropology, instructed Ferreira

18  NOT to email Plaintiff. [ONLY the University's attorney has the legal authority to instruct Dr. Ferreira not

19  to email Plaintiff.]

20  B. Ferreira met with Dr. Paul Sherwin, Ph.D., Dean of the College, to raise the

21  "Mette [Plaintiff] Issue". Ferreira informed Dean Sherwin that Plaintiff would submit a lawsuit against

22  Defendant and Defendant SFSU.

23  C. Ferreira stated to Plaintiff "I don't know why he [Defendant] is picking on you

24  [Plaintiff]."

25  D. Ferreira stated to Plaintiff that Defendant acted in a similar manner with

26  Ferreira's promotion to a full professorship as Defendant did to Plaintiff. Ferreira describes Defendant's

27  actions against Plaintiff as NOT "professional".

28

E. Ferreira stated Defendant scheduled an important Department meeting, one at which Ferreira was to have critical input, on a Wednesday, a day Ferreira had to accompany Ferreira's son for a medical treatment, and hence, unable to attend the meeting.

F. In the context of a time-frame for Ferreira's role on Plaintiff's Thesis Committee, Defendant stated to Ferreira "She [Plaintiff] has seven (7) years to complete her [Plaintiff's] Thesis."

G. Ferreira stated in the November 12, 2013 email from Defendant to Plaintiff, Ferreira was not copied [cc], even though Ferreira was a member in full standing of Plaintiff's MA Thesis Committee. Ferreira stated that Ferreira became "upset" because of not being copied.

H. Ferreira stated to Plaintiff that Defendant attempted to replace Ferreira on Plaintiff's Thesis Committee with Dr. Cynthia Wilczak, Ph.D., Associate Professor of Anthropology, in violation of University rules, regulations, and policies.

143. On November 22, 2013 Dr. Mariana Ferreira emails Plaintiff a copy of the November 13, 2013 email Ferreira sent Defendant. "I [Ferreira] am very concerned that you [Defendant] forgot to cc me on a decision made by Mette Fordan's [Plaintiff's] committee, conveyed to her [Plaintiff] both in an email and in print, which I [Ferreira] am a part of as the second, and only other, reader. Hadn't I [Ferreira] asked you [Defendant] about it yesterday in person, you [Defendant] might have never thought of informing me [Ferreira]."

144. "In the contents of the letter, dated Nov. 12, 2013, you [Defendant] did not convey to her [Plaintiff] my opinion as second reader, which I conveyed to both Mette [Plaintiff] and yourself [Defendant] in emails in April, 2013, as well as recently, that I'd [Ferreira] be ready to approve her thesis when she [Plaintiff] re-wrote the conclusion. This she [Plaintiff] agreed to do....Overall, I [Ferreira] feel that you are making all the decisions about her thesis, without taking my input into consideration." [In violation of University rules, regulations, and policies.]

145. "As you [Defendant] told me [Ferreira] in person last week, you [Defendant] needed a 'second expert opinion', since I'm [Ferreira] 'not an archaeologist', the whole point of my being on her [Plaintiff] committee was that she [Plaintiff] was also taking a cultural anthro perspective, and thus thought my

input was valuable....Since my [Ferreira] advice is not being taken into consideration, and based on the input of other Anthro faculty members which you [Defendant] do not mention in the letter as part of her [Plaintiff] committee, or in any other capacity, I [Ferreira] will need to be removed from her [Plaintiff] committee retroactively from that letter (which I do not agree with)."

146. [By University rule ONLY the Graduate Student [Plaintiff] can add or remove Committee members.]

147. Spring Semester, 2014 begins January, 2014.

148. On, or about, January 20, 2014 the U.S.D.E. places Plaintiff on the normal Graduate Student deferment for enrollment for enrolling in Course LCA 499 and matriculating in the University.

149. On January 26, 2014 Plaintiff enrolls in Course LCA 499, "Culminating Experience Continuous Enrollment", from the College of Extended Learning, costing Plaintiff, personally, $300.00.

150. On February 11, 2014 Defendant emails Plaintiff. "In the months since I [Defendant] last contacted you [Plaintiff] with detailed comments on your October 2013 draft of thesis, I [Defendant] have not received a revised thesis draft or any other communication about those comments. I [Defendant] attached my November 12, 2013 email and letter to you [Plaintiff] informing you [Plaintiff] of your [Plaintiff's] position and of what you [Plaintiff] needed to do."

151. "Final thesis drafts are due by the 8th week of this term. Please submit a revised draft taking full account of the comments that I [Defendant] made to you [Plaintiff] in October (many of which were repetitions of the comments that I [Defendant] made the previous spring in reference to the previous draft you [Plaintiff] had sent to me [Defendant]. Please correct the errors that I [Defendant] had detailed, and restructure the thesis as required."

152. On April 2, 2014 Defendant emails Plaintiff. "Since I [Defendant] wrote you [Plaintiff] on February 11, I [Defendant] have not received a revised thesis draft or any other communication about the thesis or your progress....We are now past the 8th week deadline for submission of final thesis drafts for the current term....I [Defendant] ask that you [Plaintiff] make an appointment with me and the rest of your Thesis Committee to discuss your position and progress on your thesis."

153. Defendant emails a "cc" to Dr. Cynthia Ann Wilczak. [Defendant has installed Dr. Wilczak on

Plaintiff's MA Thesis Committee in violation of Defendant SFSU's rules, regulations, and policies.]

154. On April 17, 2014 Defendant sends Plaintiff a letter. "This is the last request if you [Plaintiff] do not submit a final draft of your MA Thesis that is acceptable to your Thesis Committee by the eighth week of the fall 2014 term, you [Plaintiff] will receive a grade of No Credit for the thesis class, and you [Plaintiff] will be declassified as a graduate student....As Chair of your Thesis Committee, I [Defendant] wrote you [Plaintiff] on October 6, 2013 and on April 9th, 2013 with detailed comments on your previous submissions of previous, unsatisfactory final drafts. In addition to these communications, I [Defendant] have written to you [Plaintiff] on numerous occasions requesting corrections on particular parts of your thesis, requesting meetings, and informing you [Plaintiff] of submission deadlines. The most important of these communications are the following:...."

155. [Defendant lists a series of "comments". Yet, in eight (8) semesters, four (4) years, Defendant cannot point to one material example of facilitation by Defendant, whereby Plaintiff was advanced through the process toward MA Thesis finalization and graduation.]

156. On May 31, 2014 Plaintiff concludes Course LCA 499, "Culminating Experience Continuous Enrollment", from the College of Extended Learning. The Spring, 2014 Semester concludes.

157. On, or about, May 31, 2014 the U.S.D.E. places Plaintiff on the six (6) month "Grace Period", prior to initiating the repayment schedule for the U.S.D.E.'s Unsubsidized Stafford Graduate Student Loan.

158. On, or about, December 31, 2014 the U.S.D.E. grants Plaintiff the first of two (2) one-year Deferment Periods for Plaintiff's U.S.D.E.'s Unsubsidized Stafford Graduate Student Loan.

159. On, or about, December 31, 2015 the U.S.D.E. grants Plaintiff the second of two (2) one-year Deferment Periods for Plaintiff's U.S.D.E.'s Unsubsidized Stafford Graduate Student Loan.

160. On, or about, January 1, 2017 Plaintiff begins to make monthly payments, following the U.S.D.E.'s monthly repayment schedule on Plaintiff's Unsubsidized Stafford Graduate Student Loan, serviced by Great Lakes Higher Education and Affiliates Corporation. Plaintiff's monthly payment is $218.00, down from the $1443.00 per month had Plaintiff been granted the Masters Degree and obtained Masters Degree-level employment.

161. On January 4, 2017 Plaintiff observes Graduate Student "John Doe's" rating of Professor Peter

Biella on "RateMyProfessor.com". Plaintiff learns of Biella's seven (7)-year Masters Program for Biella's Graduate Student.

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as is hereafter more fully set forth.

CAUSES OF ACTION

162. Defendants violated Plaintiff's Civil Rights by a Deprivation of Rights caused by Deceit by Collaboration and Concealment, thereby creating a Tort on Plaintiff by harming and injuring Plaintiffs economically.

FIRST CAUSE OF ACTION

(Violation of Civil Rights by Deprivation of Rights: Deceit, Deceit by Collaboration; Deceit by Concealment)

(Title 42 U.S.C. § 1983)

Plaintiffs re-allege and hereby incorporate the allegations as set forth in Paragraphs 1 through 161, inclusive above.

163. By making the statements and performing the acts, or omissions so described herein above, but not limited to, in Paragraphs 17 through 161 and hereinafter, Defendant caused and/or permitted the violation of Plaintiff's Civil Rights by Deprivation of Rights by creating and perpetrating on Plaintiff a Deceit, Deceit by Collaboration, and Deceit by Concealment with malicious and willful intent to cause irreparable harm and injury, thereby entitling Plaintiffs to seek relief and recover damages pursuant to Title 42 U.S.C. § 1983.

164. Defendant made a false representation of a matter of fact, in both statements and actions, by collaboration and by concealment of what should have been disclosed, that deceived and was intended to deceive the Plaintiff so that Plaintiff acted upon the misrepresentation to Plaintiff's legal injury.

165. The Deceit consisted of the fact that Plaintiff was placed on a seven (7) year Masters Program in Anthropology by Defendant when, in fact, no such seven (7) year Program existed, as the Masters Programs offered by Defendant SFSU and financed through Defendant SFSU's Office of Financial Aid

and underwritten by the United States Department of Education were all two (2) to three (3) year programs. A copy of the Anthropology Department and University course and Thesis requirements is labelled Exhibit "A", attached hereto, and by this reference, is made a part hereof.

166. Defendant suppressed and concealed this material fact from Plaintiff with the intent that Plaintiff be misled as to the true condition of the reason why Defendant refused to approve and sign Plaintiff's Masters Thesis Drafts of April, 2013 and October, 2013. Defendant stated to Plaintiff, orally and in writing, that Defendant would not approve and sign Plaintiff's two Thesis Drafts because of "academics", which was, in fact, a mere rationale and ruse for Defendant's deceit, which Defendant withheld in concealment from Plaintiff.

167. On November 12, 2013 Defendant entered the Anthropology Department office of Dr. Mariana Ferreira, Co-Faculty Member of Plaintiff's MA Thesis Committee, and stated to Ferreira that Defendant had placed Plaintiff on a seven (7) Masters Program in Anthropology. An Affidavit affirming said event and statement is labelled Exhibit "B", attached hereto, and, by this reference, is made a part hereof. Dr. Ferreira took full reliance in Defendant's statement, as serious and truthful, as Ferreira's reply was, "You [Defendant] mean I have three (3) or four (4) more years to be on her [Plaintiff's] Committee?"

168. Defendant's statement to Dr. Ferreira goes to Defendant's "state-of-mind" on the issue of the length of time required for Plaintiff to complete the Masters Program in Anthropology/Archaeology. Defendant was anticipating Plaintiff's completion date to be sometime in 2017.

169. On November 13, 2013 Dr. Ferreira emailed Defendant that Ferreira was ready to approve and sign Plaintiff's April, 2013 Thesis Draft [after minor changes were made to the Conclusion section], of which Defendant withheld from Ferreira, thereby usurping the power of the two-member Thesis Committee, omitting Ferreira from the decision-making process, thus making unilateral decisions violation of Defendant SFSU's rules, regulations, and policies. A copy of this email letter is labelled Exhibit "C", attached hereto, and, by this reference, is made a part hereof.

170. Plaintiff's only knowledge of Defendant's deceit came from the telephone conversation between Plaintiff and Dr. Ferreira on the evening of November 14, 2013. [Refer to Statement of Facts/ Chronology of Events Leading to Action Paragraph No. 142.]

171. From the time Plaintiff first communicated with Defendant in early September, 2009 until the date of filing of this Legal Complaint, at no time relevant, did Defendant ever reveal the nature of Defendant's deceit to Plaintiff.

172. Defendant concealed and suppressed the material fact that Defendant had placed Plaintiff on a seven (7) year Masters Program in Anthropology, when, in fact, through its Unsubsidized Stafford Graduate Student Loan, the U.S.D.E., Defendant SFSU's University Catalogue, Defendant SFSU's Office of Financial Aid, and Defendant SFSU's Department of Anthropology had placed Plaintiff on a two (2) to three (3) year Masters Program.

173. Defendant SFSU's University Catalogue for calendar year 2010-11 states that the Masters Program in Anthropology is a two (2) year, fixed-course scheduled Program. In some situations a Graduate Student may require am additional semester or two (2) in order to complete their Masters Thesis. Such a situation would require a Graduate Student to take a third (3rd) academic year. Universities and the U.S.D.E. allow for such occurrences by being highly flexible. Universities grant the time for Graduate Students to complete the writing, assembling, and finalizing of a Masters Thesis. The U.S.D.E. is accommodating by granting one (1) more, additional, year of funding with the Unsubsidized Stafford Graduate Student Loan.

174. For Graduate Students requiring additional time to complete a Masters Thesis extra time is so requested solely by the Graduate Student, or in MUTUAL agreement with the Graduate Student's Thesis Advisor. This addition of time is a procedure ALWAYS initiated by the Graduate Student, NEVER by the Thesis Advisor, unilaterally.

175. Defendant changed the terms of the binding Agreement by referring Plaintiff to Anthropology Department and University catalogues, not of August, 2010, at which time Plaintiff entered into the binding Agreement with the U.S.D.E., Defendant SFSU, and Defendant SFSU's Office of Financial Aid, but catalogues of the academic years 2012-13 and 2013-14. This action by Defendant created more process for the Plaintiff, nullifying any facilitation and expediency, thereby extending and prolonging Plaintiff's Masters Program beyond the two (2) to three (3) years to a seven (7) year Program.

176. In early September, 2009, when Defendant and Plaintiff met to discuss the Masters Program in

Anthropology/Archaeology, Defendant had full knowledge, and was informed, as to Plaintiff's academic and career goals.

177. Defendant was knowledgable, and was informed, as to Plaintiff's desire to obtain the Doctorate, Ph.D. degree, in Anthropology/Archaeology. It can be read repeatedly throughout the STATEMENT OF FACTS/CHRONOLOGY OF EVENTS LEADING TO ACTION , so stated herein above, that Plaintiff expressed to Defendant Plaintiff's concern for expediency in completing the Masters Program at Defendant SFSU in anticipation of moving on to the Doctorate Degree at another University and conserving U.S.D.E. Loan funds for such a program. It was NEVER Plaintiff's intention to prolong the Masters Program, that the Masters was NOT an "end-all" degree for Plaintiff.

178. Defendant was Chair of the Department of Anthropology from August, 2008 until May, 2011. Dr. Peter Biella, Ph.D., assumed the Department Chair position from August, 2011 until, at least, May, 2014. Defendant and Biella were extremely close professionally and in close communication.

179. On August 4, 2015 one of Dr. Biella's Graduate Students (hereinafter, referred to as "John Doe") registered a complaint against Biella with the Online Website "RateMyProfessor.com", concerning being confronted with a seven (7) year Masters program in Anthropology. A copy of "John Doe's" RateMyProfessor assessment is labelled Exhibit "D", attached hereto, and, by this reference, is made a part hereof.

180. The mere fact that two (2) Graduate Students in the MA Program in Defendant SFSU's Anthropology Department, Plaintiff and John Doe, were each placed on a seven (7) year Masters Program in Anthropology in the 2010-2015 time period, without knowledge of each other's condition, supports the collaboration and culpability in violations of Law between Defendant and Biella, in dealing with selected Graduate Students in the Department of Anthropology.

181. Defendant's deceit was intended to deceive Plaintiff so that Plaintiff acted upon said deceit to Plaintiff's legal injury. Plaintiff was reasonably so misled by Defendant that Plaintiff followed Defendant's instruction for addressing Defendant's "comments" and re-writes in a manner so prescribed by Defendant.

182. Defendant gave Plaintiff cause to believe the MA Program duration would be two (2) to three

(3) years, when, in reality, Defendant's "state-of-mind", statements, acts/actions, or omissions were that Plaintiff was required to attend the Masters Program for a length of seven (7) years.

183. Using deceit of concealment, Defendant gave Plaintiff false hope and cause to Plaintiff that with persistence, hard work and perseverance, continuous writes and re-writes, and by following Defendant's "comments", Plaintiff could meet an April, 2013, then, followed by an October, 2013 MA Program completion date and graduation.

184. Defendant used Defendant's "comments" as a pretext, rationale, and ruse for Defendant's refusal to approve and sign Plaintiff's Masters Thesis Drafts and extend Plaintiff's Masters Program to seven (7) years. Plaintiff acted upon Defendant's deceitful "comments" by attempting to comply with Defendant's requests. Plaintiff responded in such manner with each, and every, written submission to Defendant for over seven (7) semesters.

185. In April, 2013 after failing to facilitate Plaintiff to a successful Thesis Draft submission and successful outcome, Defendant rejected Plaintiff's submission and provided even more "comments". A copy of Defendant's April, 2013 "comments" to Plaintiff's Thesis Draft submission is labelled Exhibit "E", attached hereto, and by this reference, is made a part hereof.

186. After complying with Defendant's "comments" regarding the April submission, with much re-writing of entire sections, Plaintiff submitted the Thesis Draft a second time in October, 2013. Defendant had requested entirely new sections be added and requested major structural changes over the first Draft. A copy of Defendant's October, 2013 "comments" to Plaintiff's Thesis Draft submission is labelled Exhibit "F", attached hereto, and by this reference, is made a part hereof.

187. In spite of all the requests Defendant required of Plaintiff and the changes which Plaintiff made in compliance with Defendant's request, Defendant rejected the Draft for a second time, to the extent of damning the entire Draft, and the Project itself. Defendant even went so far as to tell Plaintiff to begin the Project entirely anew.

188. The mere fact that Defendant even damned Defendant's own requested changes and requirements from April's Draft for the October submission proves the Criminal Court standard of "beyond a reasonable doubt", that Defendant perpetrated a deceit on Plaintiff with the intent of extending

Plaintiff's Masters Program beyond the two (2) to three (3) years, to seven (7) years, as Defendant revealed to Dr. Ferreira on November 12, 2013.

189. In early September, 2009, or even as late as August, 2010, had Defendant been honest, truthful, and forthcoming to Plaintiff regarding the seven (7) year completion date for the Masters Degree Program, Plaintiff would have been informed. Had Plaintiff been lawfully informed in September, 2009 or in August, 2010, Plaintiff would have chosen to seek out another Professor in the Anthropology Department to become Plaintiff's Thesis Advisor, or to seek out another Department within the University to pursue Plaintiff's Project, or even leave Defendant SFSU to continue Plaintiff's Masters Degree at another University.

190. In a seven (7) year period Plaintiff, presumably, could have applied to and been accepted to the three (3) year Law School Program at the University of California, San Francisco's Hastings School of Law. After receiving the Doctorate in Jurisprudence Degree from Hastings and graduating, Plaintiff could have applied to and been accepted to the three (3) year Law School Program at Stanford University's School of Law. After receiving the Doctorate in Jurisprudence Degree from Stanford University and graduating, Plaintiff would still have had one (1) year remaining to complete Plaintiff's Masters Degree in Anthropology/Archaeology at Defendant SFSU under Defendant's direction.

191. From March, 2009 through August, 2010 to the present time Defendant gave Plaintiff, falsely, the cause to believe that if Plaintiff only did as Defendant instructed, Plaintiff would meet the date Plaintiff had set for completion of the MA Program and Graduation. While Defendant was providing Plaintiff with false hope and false encouragement, Defendant was all along, during the four (4) year relationship between Plaintiff and Defendant, concealing the truth from Plaintiff. Defendant's concealment of the truth from Plaintiff from March, 2009 until November, 2013 constitutes an act/action which lies well beyond malicious, but can only be described as premeditated, flagrant, vicious, and heinous. For such an act/action to occur so methodically and with such thoroughness in an academic setting of intellectual "give and take" between a Graduate Student and a Thesis Advisor, Defendant BAILEY's acts/action can only be described as illogical and pathological in nature.

192. With respect to Plaintiff, Defendant made untrue assertions of fact. Defendant, at all times

relevant, withheld the truth from Plaintiff. Defendant's nondisclosure is the equivalent of an assertion of fact. Plaintiff was owed a duty by Defendant to be truthful and honest. Defendant's failure to disclose the truth is the equivalent of an assertion that the fact did not exist.

193. Pursuant to Title 42 U.S.C. § 1983 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

194. Defendant's deceit was planned, in collaboration with Dr. Peter Biella, Ph.D., Professor of Anthropology, and perpetrated on Plaintiff by Defendant in, and of, the State of California in violation of the Laws of the State of California pursuant to California Civil Code Sections: 1427; 1428 (2); 1430; 1431 (b)(1); 1571; 1572 (1), (3), (4) and (5); 1573 (1) and (2); 1574; 1575 (1), (2) and (3); 1709; 1710; 2306; 2313.

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as is hereinafter more fully set forth.

SECOND CAUSE OF ACTION

(Violation of Civil Rights by Deprivation of Rights: Interference and Alteration of the Financial Commerce Between Plaintiff, the United States Department of Education, Defendant SFSU, and Defendant SFSU's Office of Financial Aid)

(Title 42 U.S.C. § 1983/Constitution of the United States, Article I, Section8, Clause 3)

Plaintiffs re-allege and hereby incorporate the allegations as set forth in Paragraphs 1 through 194, inclusive above.

195. By making the statements and taking the actions, or omissions, so described herein above, but not limited to, in Paragraphs 17 through 161 and hereinafter, Defendant caused and/or permitted the violation of Plaintiff's Civil Rights by Deprivation of Rights by interference and alteration of Plaintiff's Financial Commerce with the United States Department of Education, with malicious and willful intent to

1   cause irreparable harm and injury, thereby entitling Plaintiff to seek relief and recover damages pursuant

2   to Title 42 U.S.C. § 1983.

3      196. Defendant interfered with and obstructed the Regulation of Interstate Commerce (terms of the

4   Financial Agreement) between Plaintiff, the U.S.D.E. (underwriter of Plaintiff's Unsubsidized Stafford

5   Graduate Student Loan) and Defendant SFSU's Office of Financial Aid (the dispersement party) by

6   altering the terms of the U.S.D.E. Unsubsidized Stafford Graduate Student Loan from two (2) to three (3)

7   years to seven (7) years. The Financial Relationship between the parties was agreed to and codified in

8   written financial documents by binding Contractual Agreement between the parties in, or about, April/

9   May, 2010. [Note: These written documents were electronic, online documents executed by the Plaintiff,

10   the U.S.D.E. and Defendant SFSU's Office of Financial Aid. Plaintiff has had no access to these

11   documents as of May 31, 2014, at which time Plaintiff began non-enrollment status.]

12      197. Pursuant to Article I, Section 8, Clause 3 <u>ONLY</u> Congress shall have the power to regulate

13   Plaintiff's Interstate Financial Commerce with the United States Department of Education, <u>NOT</u>

14   Defendant. Congress granted statutory authority to the U.S.D.E., in establishing the U.S.D.E., for

15   self-regulation of its financial instruments, such as Plaintiff's Unsubsidized Stafford Graduate Student

16   Loan.

17      198. Pursuant to Congressional Authority <u>ONLY</u> the U.S.D.E. has the power to alter the financial

18   terms of the binding Agreement between Plaintiff and the U.S.D.E., <u>NOT</u> Defendant.

19      199. Defendant, at all times relevant, was <u>NOT</u> granted authority to alter the Interstate Financial

20   Commerce between the U.S.D.E./Great Lakes Student Loan Servicing Company and Plaintiff.

21      200. Through Defendant's statements and actions Defendant extended, without just cause,

22   Plaintiff's MA Program by two (2) additional semesters after Plaintiff had completed <u>ALL</u> Anthropology

23   Department and University requirements, thereby requiring Plaintiff to utilize a greater loan amount than

24   would have been, otherwise, necessary and/or required. This additional time required by Defendant

25   created for Plaintiff, without just cause, increased interest accruement costs to Plaintiff's Loan.

26      201. Defendant's statements and actions, thereby, created for Plaintiff a jeopardy by a higher

27   repayment schedule rate and, thereby, creating risk to Plaintiff for default, placing Plaintiff at future

28

1   financial risk.

2   202. By interference and alteration of the terms of the binding Financial Agreement from two (2) to

3   three (3) to seven (7) years, Defendant placed Plaintiffs at future financial risk.

4

5   WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as is

6   hereinafter more fully set forth.

7   THIRD CAUSE OF ACTION

8   (Violation of Civil Rights by Deprivation of Rights: Denial of Equal Protection of Rights)

9   (Title 42 U.S.C. § 1983/5th and 14th Amendments to the United States Constitution)

10   Plaintiffs re-allege and hereby incorporate the allegations as set forth in Paragraphs 1 through

11   202, inclusive above.

12   203. A California State entity, a member of the California State University system, Defendant

13   SFSU, through its employee and agent, the Defendant, created for Plaintiff an action unlike any other

14   graduate student receiving a U.S.D.E. Unsubsidized Stafford Graduate Student Loan by placing Plaintiff

15   in a seven (7) year Masters Program.

16   204. As a result of Defendant's and/or Defendant SFSU's statements, actions, or omissions,

17   Plaintiff was denied Equal Protection of the Law as pertaining to all other United States Department of

18   Education Unsubsidized Stafford Graduate Student Loan recipients in the Anthropology Department and

19   in all other Departments at Defendant SFSU, in all other colleges and universities in the State of

20   California, and in all other colleges and universities throughout the other forty-nine (49) States of the

21   United States by being placed in a seven (7) year Masters Program in Anthropology.

22   205. Plaintiff was denied by Defendant and Defendant SFSU Equal Protection of the Law as all

23   other United States Department of Education Unsubsidized Stafford Graduate Student Loan recipients

24   who were placed in the two (2) to three (3) year Masters Program.

25   206. Defendant and Defendant SFSU created for Plaintiff a "separate and unequal" pathway to the

26   Masters Degree as compared to all other Masters candidates at Defendant SFSU, at other colleges and

27   universities throughout the State of California and throughout the United States.

28

207. The U.S.D.E.'s binding Financial Contractual Agreement with Plaintiff required that all Unsubsidized Stafford Graduate Student Loan recipients receive financial assistance for ONLY a two (2) to three (3) year Masters Program.

208. The U.S.D.E.'s Stafford Program establishes dispersement for three (3) years, maximum, followed by a six (6) month "grace" period, followed by two (2) one (1)-year deferment periods before the Loan repayment schedule begins, at the request of the borrower.

209. Plaintiff reached the maximum U.S.D.E. loan amount of $59,000 after three (3) years. Plaintiff was on the "grace" period from approximately May to December, 2014. Plaintiff requested, and was granted, two (2) one (1)-year deferment periods, which ran consecutively from January, 2015 to January, 2017. Plaintiff began making monthly installment repayments beginning February, 2017 on a Stafford Loan for which NO Masters Degree was granted by Defendant SFSU.

210. Pursuant to Title 42 U.S.C. § 1983/5th and 14th Amendments to the United States Constitution, Defendants, and each of them, violated the following United States Federal Statutes and Code of Federal Regulations with respect to Plaintiff's Equal Protection Rights: Title 20 U.S.C. Sections 1018 (a)(2)(F); 1018 (b); 1018 (b)(1); 1018 (b)(2); 1018 (b)(2)(A); 1019 a; 1019 b; 1019 b(c)(3); 1075; 1077 (a)(2)(B); 1078-8; 1080; 1080 a; 1082; 1083; 1083 a; and 1091 a and Title 34 Code of Federal Regulations Sections 601.10 (a)(1)(i); 601.10 (c)(1); and 601.10 (c)(2).

211. Defendant violated 20 U.S.C. § 1018 (a)(2)(F) when Defendant interfered with the U.S.D.E.'s implementation of an open, common, integrated system for the delivery of Plaintiff's financial assistance.

212. Defendant violated 20 U.S.C. § 1018 (b) when Defendant interfered with the Secretary of Education and the Chief Operating Officer, carrying out provisions of the Law as relates to Plaintiff.

213. Defendant violated 20 U.S.C. § 1018 (b)(1) when Defendant interfered with the General Authority of the Secretary of Education in developing regulations, policies, administrative guidance, or procedures affecting the Federal student financial assistance program with respect to implementation to Plaintiff.

214. Defendant SFSU and Defendant SFSU's Office of Financial Aid violated 20 U.S.C. § 1018 (b)(2) concerning a Performance-Based Organization's ("PBO") responsibility for managing the

administrative and oversight functions supporting Plaintiff's Program authorized under student assistance.

215. Defendant, Defendant SFSU and Defendant SFSU's Office of Financial Aid violated 20 U.S.C. § (b)(2)(A) concerning the administrative, accounting, and financial management functions for Plaintiff's Federal student financial assistance program.

216. Defendant SFSU and Defendant SFSU's Office of Financial Aid violated 20 U.S.C. § 1019 a regarding the responsibilities of Covered Institution's duty owed Plaintiff.

217. Defendant, Defendant SFSU and Defendant SFSU's Office of Financial Aid violated 20 U.S.C. § 1019 b by interfering with the duties of the Secretary of Education, the Lender Institution, and the Covered Institution with respect to Plaintiff.

218. Defendant, Defendant SFSU and Defendant SFSU's Office of Financial Aid violated 20 U.S.C. § 1019 b(C)(3) with respect to the requirement of the Covered Institution's Code of Conduct in notifying Plaintiff of any alteration of Plaintiff's Masters Program.

219. Defendant and Defendant SFSU violated 20 U.S.C. § 1075 by interfering with the limitations set on Plaintiff's Federally Insured Loan and Federal Loan Insurance by requiring Plaintiff to extend Plaintiff's MA Program from two (2) additional Semesters (Fall, 2013 and Spring, 2014) to six (6) additional Semesters, seven (7) years. Defendant created for Plaintiff an MA Program which exceeds the U.S.D.E.'s limits.

220. Defendant and Defendant SFSU violated 20 U.S.C. § 1077 (a)(2)(B) with respect to the eligibility of Plaintiff's "Borrows and Terms" of Plaintiff's Unsubsidized Stafford Graduate Student Loan pertaining to Plaintiff's repayment schedule of over ten (10) years.

221. Defendant violated 20 U.S.C. § 1078-7 and 8 with respect to providing Plaintiff with documentation establishing a seven (7) year MA Program in Anthropology/Archaeology and the requirements for the determination and documentation of Plaintiff's estimated cost of attendance and Plaintiff's estimated financial assistance. Such requirements by Defendant for documentation setting forth a schedule for disbursements of proceeds of the loan in installments, consistent with the requirements of Section 1078-7 of this Title.

222. Defendant's statements and actions placed Plaintiff at risk of violation of 20 U.S.C. § 1080.

223. Defendant's statements and actions placed Plaintiff at risk of being reported to Consumer Reporting Agencies and Institutions of Higher Learning, thereby endangering Plaintiff's financial and economic security.

224. Defendant violated 20 U.S.C. § 1082 with respect to interference with the Secretary of Education's lawful duties as imposed on Plaintiff by Law.

225. Defendants violated 20 U.S.C. § 1083 by failing to provide full disclosure to the U.S.D.E. that Plaintiff was placed by Defendant on a seven (7) year MA Program in Anthropology.

226. Defendants violated 20 U.S.C. § 1083 a  by failing to provide Plaintiff full disclosure that Plaintiff was placed on a seven (7) year Masters Program in Anthropology/Archaeology.

227. Defendant's statements and actions placed Plaintiff at risk of falling under 20 U.S.C. § 1091 a with respect to Statute of Limitations and State Court Judgments.

228. Defendant, Defendant SFSU, and Defendant SFSU's Office of Financial Aid violated the Code of the Federal Regulations Title 34 CFR Sections 601.10 (a)(1)(i); 601.10 (c)(1); and 601.10 (c)(2) by failing to provide full disclosure that Plaintiff was placed on a seven (7) year Masters Program in Anthropology/Archaeology at Defendant SFSU.

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as is hereinafter more fully set forth.

Plaintiffs re-allege and hereby incorporate the allegations as set forth in Paragraphs 1 through 228, inclusive above.

## LIABILITY OF DEFENDANT SAN FRANCISCO STATE UNIVERSITY

229. Defendant SFSU is, and was, at all times relevant, a University, a campus of the California State University system, conducting activities in the State of California, County of San Francisco. Defendant SFSU is authorized to conduct all activities of a University, including, but not limited to, the granting of undergraduate Baccalaureate and graduate Masters Degrees. As part of those activities, in certain operations, Defendant SFSU is incorporated in the State of California as a business (UCORP). UCORP is that portion of Defendant SFSU handling the University's risk assessment insurance program.

As both a University and a Business Defendant SFSU is responsible for conducting all activities lawfully, under the Laws of the State of California and the United States. Therefore, Defendant SFSU is lawfully responsible, as an educational institution and a business, to ensure that its employees comply with the Laws of the State of California and the United States. Defendant SFSU can act "only" through Defendant SFSU's agents. When one of Defendant SFSU's employees, one of Defendant SFSU's agents, violates State Laws with respect to the official capacity of its employee, Defendant SFSU is liable for the statements, acts/actions, and omissions of its employee. Additionally, Defendant SFSU's liability arises through the Legal Doctrine of "respondeat superior". Under the Doctrine, an employer is liable for an employee's torts if those torts are committed within the scope of the employee's employment.

In Plaintiffs' Complaint, as herein so stated, Plaintiffs allege that one of Defendant SFSU's employees, Defendant BAILEY, so violated the Laws of the State of California and the United States with respect to Plaintiff. Defendant SFSU, therefore, is lawfully responsible for the statements, acts/actions, or omissions of its employee, Defendant BAILEY.

LIABILITY OF DEFENDANT DR. LESLIE E. WONG, PH.D.

230. DR. LESLIE E. WONG, PH.D. is, and was, at all times relevant, President and Chief Executive of Defendant SFSU. Defendant WONG, as President and Chief Executive, is responsible for the statements, acts/actions or omissions of employees, both Faculty and Staff under Defendant SFSU's employ. Defendant WONG, with respect to the operations of Defendant SFSU, is responsible for oversight and for seeing that Defendant SFSU's Faculty and Staff employees comply with all Laws of the State of California and of the United States and conduct themselves lawfully, with respect to their official capacities on campus. Additionally, Defendant WONG's liability arises from the Legal Doctrine of "respondeat superior". The Doctrine is a rule of "imputed" or "vicarious" liability on behalf of the relationship of the principal to the employee or agent. Defendant BAILEY is an employee under, and reports to, Defendant WONG. A principal is liable for an agent's misrepresentations. Defendant WONG, as principal for Defendant BAILEY, the agent, is liable for, including, but not exclusive, nor limiting to, specific statute(s), (a) specific date(s), or (a) specific event(s) in the violation of California Civil Code Sections 2330; 2332; 2333; 2338; 2339; and 2343 (3). Defendant BAILEY, the agent, with respect to

COMPLAINT

Defendant WONG, the principal, is liable for, including, but not exclusive, nor limiting to, (a) specific statute(s), (a) specific date(s), or (a) specific event(s) in the violation of California Civil Code Sections 2019; 2020; 2295; 2298; 2299; 2305; 2306; 2313; 2315; and 2322 (a) and (b).

## DISCRETIONARY ACTS IMMUNITY

231. California Government Code Section 820, Subsections (a) and (b) place qualifications on Defendants BAILEY and WONG. Section 820 states "...a public employee is liable for injury caused by his act or omission to the same extent as a private person." Also, it states "The liability of a public employee established by this part...is subject to any defenses that would be available to the public employee if he were a private person." If Defendants were employed by a private University, such as the University of Southern California, performing the same duties and obligations Defendants have performed, and currently perform, Defendants, pursuant to Section 820 (a) and (b), lack immunity and could be sued by Plaintiffs.

232. For Defendant, in writing so-called "comments", the "discretion" between a teacher and student is <u>NOT</u> of the same level as the "policy-making" discretion of City, County, and/or State "Public Policy"-makers, which provides the foundation for the Discretionary Acts Immunity. At what point does Defendant's so-called "comments" cease being "discretionary" and "academic" and become rationalization and a vehicle through deceit for the continuation of a process to deny Plaintiff completion of a Masters Thesis and Graduation?

## DEFENDANT SFSU'S CONFLICT RESOLUTION POLICY AND GRIEVANCE PROCEEDINGS

233. In early summer, 2011 Plaintiff was preparing for the Anthropology Department's Foreign Language Assessment Examination (FLAE) requirement of all Anthropology Graduate Students. In Plaintiff's Thesis research, Plaintiff learned of two Norwegian anthropologists who published recent articles in Plaintiff's area of specialization. Other Norwegian anthropologists had published recent findings in other relevant aspects of Plaintiff's research in the area of Cultural Anthropology.

234. In July, 2011 Plaintiff contacted by email Dr. Mark Griffin, the Anthropology Department Graduate Coordinator, the faculty member responsible for conducting the FLAE. Plaintiff inquired of

Griffin how Plaintiff should proceed using Norwegian for the FLAE. Griffin replied to Plaintiff by email, stating that the Department Graduate committee would have to rule on the use of the Norwegian language to satisfy the FLAE requirement. The Committee would meet in September, 2011 and Griffin stated that Griffin would put Plaintiff's request on the meeting agenda.

235. On September 14, 2011 Plaintiff received an email from Griffin (cc Dr. Peter Biella, Department Chair, and Defendant) denying Plaintiff's request to use Norwegian to satisfy the FLAE requirement. Plaintiff, thereafter, emailed Defendant registering a complaint over the Graduate Committee's decision against Plaintiff. Plaintiff stated to Defendant that the Committee's decision was discriminatory against Plaintiff because other Department Graduate Students took the FLAE in their native languages.

236. Plaintiff then, during routine or regular office hours, met with Dr. Biella in his office. Clearly upset and with hostile, antagonistic and aggressive behavior, Biella stated that because Plaintiff had used the word "discriminatory", the Department was required by policy to forward Plaintiff's email to both the Dean of the School of Social Sciences and the University Provost.

237. Additionally, Biella suggested to Plaintiff that Plaintiff locate a paper in, for example, German, memorize the content and then take the test. [What Biella suggested to Plaintiff was cheating on the FLAE. Later, Plaintiff met Defendant and reported the incident to Defendant. Defendant stated orally to Plaintiff "Why THAT is cheating!"]

238. Plaintiff then proceeded to appeal the Committee's Ruling to the Dean of the School of Social Sciences. The Dean refused to meet with Plaintiff. Plaintiff was only allowed to meet with the Assistant Dean. The Assistant Dean wrote down the information and stated to Plaintiff that "we will get back to you [Plaintiff]." Less than 24 hours after meeting, the Assistant Dean emailed Plaintiff with a decision supporting the Anthropology Department Committee. A 24-hour period was clearly an insufficient time for the Assistant Dean to research, fact-find and render an assessment of the facts. Plaintiff took this action as a "Star Chamber" process, whereby the University would never entertain a ruling which went contrary to the faculty or a Graduate Committee. Moreover, Plaintiff never received any contact whatsoever from the Provost, the Provost's office or any other individual.

PLAINTIFF'S COMPLIANCE WITH THE GOVERNMENT CLAIMS ACT

239. The Government Claims Act (hereinafter, referred to as the "ACT") provides California State and Local Public entities and their employees may be held liable for injuries. "A public entity may sue and be sued." [California Government Code § 945] "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." [California Government Code § 815.2 (a)] "A public employee is liable for injury caused by his act or omission to the same extent as a private person." [California Government Code § 820]

240. Before filing a lawsuit for money or damages, however, a potential plaintiff must first submit a timely written claim to the appropriate public entity. [California Government Code § 945.4]

241. The ACT requires that all claims against a California State University campus follow a separate filing process from all other State Government offices. "The Trustees of the California State University shall act on a claim against the California State University in accordance with the procedure that the Trustees of the California State University provide by rule." [California Government Code § 9122.5 (a)]

242. Typically, a person must first give written Notice within six (6) months of filing an actual lawsuit, giving the governmental agency time to Settle the claim. The "essence" of the Government Claims Act is two-fold. First, a prospective plaintiff must give "Notice" in order to avoid the "surprise"-factor of a sudden lawsuit being filed against the government entity. Second, the government entity makes every effort possible to "Settle" the issue the prospective plaintiff raises. The government entity desires to "Settle" the matter in order to avoid lengthy and costly legal proceedings to both parties. If this process fails, the prospective plaintiff is free to file a lawsuit against the government entity.

243. On October 6, 2013 Defendant rejected and refused to affix Defendant's signature to Plaintiff's Final Draft Thesis submission.

244. On October 7, 2013 Plaintiff retains San Francisco Attorney Mr. Avner D. Sofer, Esq. [California Bar No. 198736; with offices located at 1700 Montgomery Street, 1st Floor, San Francisco,

CA 94111]. Plaintiff remained an active, registered Graduate Student at Defendant SFSU until May 31, 2014.

245. On October 25, 2013 Attorney Sofer writes a letter to Dr. Mark Griffith [Griffin], Ph.D., Graduate Coordinator, Anthropology Department. A copy of said letter is labelled Exhibit "G", attached hereto, and, by this reference, is made a part hereof. Attorney Sofer provides "Notice" to the entity, San Francisco State University, and the entity's employee and Department Graduate Coordinator, and requests a "Settlement"/"Resolution" of the conflict prior to initiating litigation.

246. On October 28, 2013 Attorney Sofer writes a letter to Defendant BAILEY. A copy of said letter is labelled Exhibit "H", attached hereto, and by this reference, is made a part hereto. Attorney Sofer provides "Notice" to the entity, San Francisco State University, and the entity's employee and Plaintiff's Thesis Thesis Advisor, and provides an offer of "Settlement"/"Resolution" of the conflict prior to initiating litigation.

247. Between October 28, 2013 and November 7, 2013 Defendant passes on a copy of the October 28 Sofer Letter to Defendant SFSU's, the entity's, Chief Legal Advisor and University Counsel, Attorney Ms. Patricia B. Bartscher, Esq.

248. On November 7, 2013 Defendant SFSU's, the entity's, Chief Legal Advisor and University Counsel, Attorney Ms. Particia B. Bartscher, Esq. writes a letter to Plaintiff's Attorney Avner D. Sofer, Esq.. A copy of said letter is labelled Exhibit "I", attached hereto, and by this reference, is made a part hereto. Defendant SFSU's, the entity's, Attorney Bartscher acknowledges, NOT ONLY Plaintiff's "Notification" BUT, offers Plaintiff a "Settlement/Resolution" process in order to prevent litigation. Furthermore, Defendant SFSU's, the entity's, Attorney Bartscher, proverbially, "leaves the door open" to further "discuss the situation" with Plaintiff and Plaintiff's legal counsel.

249. In September and October, 2011 Plaintiff attempted to utilize Defendant SFSU's "Conflict Resolution Policy and Grievance Proceedings" to challenge the outcome to the Anthropology Department's implementation of the Foreign Language Assessment Examination with respect to Plaintiff. During that Grievance/Resolution Process Plaintiff was subjected to a "Star Chamber" experience. It was some days after receiving the Assistant Dean's email that Plaintiff discovered the "Grievance/Resolution"